JOHNSON, Judge.
The plaintiff, Charles Pfizer & Co., Inc., by this suit is claiming to collect from the defendant, Southbilt Feed Mills, Inc., the sum of $19,444.43, as the unpaid portion of an open account for premixed concentrate chicken feed purchased by defendant from the plaintiff. After trial the Civil District Court for the Parish of Orleans rendered judgment in favor of the plaintiff as prayed for. Defendant has appealed.
The defendant’s answer admits the purchase of the merchandise from plaintiff in the amount claimed but denies that the said amount is due and owing. By way of re-conventional demand, defendant sets up a counterclaim against the plaintiff originally for the sum of $101,644.64, (later reduced to $40,056.04) which defendant asserts is due it for loss of egg production because of alleged defective and deficient chicken feed purchased from plaintiff. The trial court dismissed defendant’s re-conventional demand.
Louisiana Hatcheries, Inc., appearing herein by intervention, alleged that interve-nor owns large flocks of chickens and that intervenor purchased from defendant the premix feed which plaintiff sold to defendant with which premix intervenor made up the chicken feed which intervenor also alleges was defective and deficient and which feed caused the hens to lay soft-shell eggs and reduced egg production to a loss of $62,407.93, the amount which inter-venor claims to recover. The intervention was also dismissed by the trial court.
The prime issues in the case are raised by the reconventional demand of defendant and the third party intervention. It was stipulated at the trial that these two corporations are one and the same. The witnesses made no attempt to distinguish one from the other and what we say in this discussion with respect to the defendant may be construed as applicable to the in-tervenor as well.
It was explained that defendant contracts with independent farmers or growers who own the physical facilities and equipment and the defendant- buys baby chicks which are delivered to the farmers who attend the flocks, gather and deliver the eggs to defendant for an agreed consideration. The defendant furnishes the feed and supervises the operations. There are some 125,000 hens in production on about 75 farms at all times. Mr. R. J. Tricou, Sr., is president of both corporations and from his testimony it can safely be deducted that he is not only the guiding head of the business, he is an educated person with a great deal of learning and experience in this field. He started this poultry business in 1926. The testimony shows that Mr. Tricou enjoys experimenting with different formulas of feed and methods of operation to attain the most profitable results. He wrote this premix formula and called upon this plaintiff to prepare it. The point at issue here is in defendant’s allegation that the premix does not include the quantity of vitamin D-3 represented by 124,560 International Chick Units per pound of premix called for by the formula. The premix is a concentrate packaged in bags containing 16 pounds of premix to the bag. To obtain the proper proportions of *190 ingredients in the chicken feed one bag of the concentrate is mixed into two tons of gross feed, containing quite a number of desired products, such as corn, soy bean meal, alfalfa meal, hay, etc., etc.
Several professional experts testified in this case. Most of them were disinterested witnesses in that they were not employed by nor connected with any party to the suit. We gain from them a very definite impression that the plaintiff is well known in the field of animal feed preparation, with a good reputation for reliability and efficiency. Plaintiff’s claim being admitted, the defendant is the plaintiff in recon-vention and bears the burden to prove, first, that the premix concentrate sold by plaintiff fell short of substantial compliance with defendant’s prescribed formula with respect to vitamin D-3, and, second, if there were no such compliance did such shortage of vitamin D-3 result in soft-egg shells and reduced egg production of marketable eggs to cause the loss complained about ?
Defendant started using plaintiff’s premix in June 1965, and continued its use through February, 1966, a period of about eight months. The testimony shows that reduced egg production was first noticed about August, 1965. It being known that hens do not lay as many eggs in hot weather as in other months, the reduced production was not considered too serious at that time. Then hurricane Betsy came in early September and, as expected, there was considerable drop in egg production because of that weather disturbance. When the hens did not recover from that interruption in a few weeks, defendant’s employees began to investigate. They called in experts from L.S.U. and other places. They found no disease or other pathological condition to cause reduction in egg production. Different types of tests were made locally. One was the dissection of a hen and it was discovered that a soft-shell egg was about to be layed by the hen. The nests and houses were inspected and evidence that the hens were laying quite a number of soft-shell eggs was found. The defendant advised plaintiff of this discovery. Plaintiff sent a specialist to inspect the farms and found no ready answer to the problem. Plaintiff sent feed samples to Rosner-Hixson Laboratories, of Chicago, for analysis. Their reports showed that one batch of feed sample contained 101,300, another batch contained 100,000 ICU’s and two other groups an average of 98,800 ICU’s per pound. Dr. Rosner, of the Rosner-Hixson Laboratories, testified that these results were arrived at by biological assay of young chickens which had been fed separate samples of feed in groups for several weeks, after which the fibula, a bone of the leg of the chick, was taken out and burned and the ashes analyzed. This manner of test, he said, is attendant with some inaccuracy, which requires an allowance of 25 to 30% variability. It was his conclusion that the feed complied with the requirements of the formula and the label of ingredients under which the feed was sold, and that the product was consistent with plaintiff’s claim of 124,560 IC units of vitamin D-3. Dr. Ros-ner and other experts who testified were in agreement that the results of the assay method and the tests showing at least 500 units per gross feed per pound, which these samples produced, is not disparate with the claim of plaintiff of the vitamin content of 124,560 units per pound of premix concentrate. We note here that chemical analysis made by some other laboratories, the report of which shows the vitamin D content in terms of U. S. Pharmacopoeia, which is no indication of the vitamin content in International Chick Units, the only standard by which this formula is determined.
Mr. Tricou, Sr., testified that the chemical tests are worthless and he thinks it is not accurate to use a young chick for this biological assay, because he thinks that the body of the young chick needs and shows less D-3 vitamin than a laying hen, but chemists and nutritionists say that the requirement of the body for bone develop *191 ment is as great per pound in the young chick as the need of the hen and that the assay of the young chick is the best way to make the test.
There is a great deal of testimony about the productivity of hens at different ages. The young chicks are placed on the different farms in groups to maintain some uniformity in the ages of the laying hens. We do note, however, from a table entitled “Comparative Ages of Hens in Commercial Flocks For the months of June, 1965 and February, 1966,” that in February, 1966, the flocks contained 42,881 hens in the age brackets of 11 to 14 months as against 1,779 hens of the same age in June, 1965. From this age bracket egg production decreases. This should account for some of the reduction complained of.
It is also shown that the chicken is possessed of highly emotional characteristics. They are easily disturbed. They respond adversely to many things, including the weather and the seasons. There is testimony that, generally spéaking, the more a chicken eats the more eggs it will lay. The defendant set up test houses and fed the respective flocks in the houses different brands of feed. It is said that the chickens which ate brands of feed other than that made from plaintiff’s premix produced more eggs than the chickens which ate plaintiff’s product. We would believe that one answer to that could be that the chickens liked the other food better and ate more of it and, therefore, produced more eggs as a direct result.
In order to prove the amount of defendant’s claim in money, a production rate of 60% of the flock was used as an arbitrary standard. Mr. Tricou testified that while they had losses through the eight months period in question, he excluded anything prior to September, 1965, and confined his claim for loss from September to February of that period. An examination of that table shows that in every month prior to September the production was 60% and over.
While there is no testimony to prove it, one contention of defendant is that even if there were sufficient vitamin content in the premix, the pellets containing the vitamin in plaintiff’s product could have been coated with a substance so thick and indigestible that the chickens could not readily assimilate the vitamin and, therefore, the result is the same as if a sufficient quantity of the vitamin was not in the feed. Plaintiff’s expert explained that the vitamin is not coated but is mixed with a gelatin and it is a gelatinous mixture rather than a coated pellet. This contention of deficiency made by defendant indicates the speculative nature of most of the reasons and testimony advanced by defendant with respect to the causes of its loss.
There are over 300 pages of technical testimony by a number of Ph.D.’s and other people who apparently know a lot about chickens and the poultry business. A study of the testimony and exhibits is convincing that defendant has failed to prove that there was definitely any shortage of the vitamin content of the formula and, therefore, the plaintiff cannot be responsible'for defendant’s loss. We agree fully with the trial judge in holding for the plaintiff and quote, with approval, the following excerpt from his written reasons:
“Plaintiff in reconvention, who will' hereinafter be referred to as Southbilt,, in the testimony offered, did establish that there was an appreciable drop in the egg production of certain of its flocks. After establishing that fact, it endeavored to show that the drop of production was due to either a deficiency or insufficiency of the vitamin content in its product. In our opinion, Southbilt failed to establish by a preponderance of the evidence that the drop of production was. due to the causes alleged or that the defendant in reconvention (hereinafter referred to as Pfizer) was guilty of any negligence whatsoever, either in the preparation, manufacturing or the composition of the product in question.
*192 “Realizing its failure to carry its burden of proof, Southbilt now urges that the principle of res ipsa loquitur is applicable and states that it showed that the drop in production could only be the result of deficiency in vitamin content of the premix and therefore, Southbilt urges, it is the burden of Pfizer to show that it is free from negligence. Although we are of the opinion that the legal principle of res ipsa loquitur is not applicable in the instant case, and we are further of the opinion that Southbilt failed to establish that the drop in production was solely and only the result of Pfizer’s product, yet, assuming res ipsa loquitur to be applicable and assuming further that the burden shifted to Pfizer to show that it was free from fault, we find that a preponderance of the evidence establishes that Pfizer was free of fault.”
For these reasons, the judgment appealed from is affirmed, with costs to be paid by defendant.
Affirmed.